### 15945. RICH *v.* THE STATE.

1. "Though the person outraged swears that the crime of rape was actually committed by the prisoner, yet where an attempt is made to impeach her testimony, and her age and the circumstances surrounding the criminal act render her testimony on this subject doubtful, the jury may dis-

regard it and find the accused guilty of an assault with intent to rape, there being overwhelming evidence of such assault." Jones v. State, 68 Ga. 760 (4). Under this ruling and the facts of the instant case, the verdict of assault with intent to rape was authorized, and the court did not err in charging the jury upon that offense.

2. Exception was taken to the following excerpt from the charge of the court. "The jury is bound exclusively to the evidence that has been introduced on the stand and allowed by the court, either oral or such other evidence admitted for your consideration to go to the jury, and applying these rules which I have given you in charge." The sentence immediately preceding this excerpt was as follows: "A juror can never use anything he may know himself respecting the case, or respecting the facts in the case, or the circumstances—you can't use that—a jury can never be governed by anything called public sentiment." In view of this context, and the fact that the court had correctly instructed the jury upon the weight to be given the defendant's statement, the excerpt is not subject to the criticism that it excluded from the consideration of the jury the defendant's statement. See, in this connection, Cobb v. State, 11 Ga. App. 52 (1 a) (74 S. E. 702); Bragg v. State, 15 Ga. App. 623 (4) (84 S. E. 82); Dunn v. State, 18 Ga. App. 95 (4) (89 S. E. 170).

3. The verdict being for an assault with intent to rape, it is immaterial whether there was error in the charge upon the law of assault and battery.

4. In a trial for rape, where the verdict is for an assault with intent to rape, it is no ground for a new trial that the testimony of the alleged victim was not corroborated. Wade v. State, 27 Ga. App. 650 (2) (109 S. E. 511), and citation. Under this ruling it is immaterial whether the judge correctly charged upon the law of corroboration.

5. The other grounds of the motion for a new trial are without merit.

DECIDED DECEMBER 9, 1924. REHEARING DENIED JANUARY 15, 1925.

Conviction of assault with intent to rape; from Union superior court—Judge J. B. Jones. September 13, 1924.

Application for certiorari was made to the Supreme Court.

J. G. Collins, B. P. Gaillard Jr., V. M. Waldrup, C. J. Wellborn, for plaintiff in error.

Robert McMillan, solicitor-general, contra.

BROYLES, C. J. The first headnote alone needs elaboration. The defendant was tried under an indictment charging rape, and was convicted of an assault with intent to rape. The undisputed evidence in the case shows that on December 22, 1923, Docia Thompson, who had just turned eighteen years old, attended, in company with Mattie Burns and two other girls, a Christmas-tree celebration at Ivy Log Schoolhouse in Union county; that the defendant was also there; that when the party broke up, the defendant and Docia started walking along the public road towards her home,

and that Mattie Burns and Letha Townsend were walking a little distance in front of them; that when they came to a little trail that went through the woods, Mattie and Letha took it, but the defendant and Docia continued in the road. Docia testified that when the girls had gotten out of sight, the defendant said to her, "Let's stop and talk a while;" that it was raining a little, and she said, "I can't. Letha will be going on and leave me, and I have to stay with them." Docia's testimony continued as follows: "Well, he grabbed me, and I tried to get away and asked him to quit, and said, 'Please don't,' but he paid no attention to me. He grabbed hold of me and pushed me back and threw me down, and I pulled his hair and pulled out a right smart I think, and I picked up a rock—I would not say for sure it was a rock—and I hit him on the head with the rock several times, but he did not quit, and then I commenced screaming and holloing, but he did not turn me loose. Was on the ground when I hit him, that was the only way I had of helping myself by using my hands; . . was dressed in a brown silk dress and a brown coat, had on underclothing, had on a white petticoat. When he threw me down and at the time I pulled his hair he was on me. I don't know for sure that he had my clothes up, but I suppose he did. My clothing were up. I did not pull them up. I reckon Clovis Rich pulled them up; there was nobody else there. My dress was torn up and ruined. He penetrated my privates with his privates. It was not with my consent. Only had my hands to protect myself. I took hold of his privates with my hand and pulled it away from me. When I got up I started to run, and he grabbed me by the coat, and I pulled loose and left him standing there, and he holloed to me and said to wait there, and I just went on. A button was torn off my coat. I lost my hair net there at that place. There was considerable scuffling there between me and the defendant. I tried to get away from him and left him standing there, left him quick as I could get away. I never looked back. The last I saw of him he holloed, I looked back and he was standing there at the same place. I was going home. The first person I saw after that was Mattie Burns; told her about the trouble. I went on down the road that Mattie went and stopped at her house, and then went home. I had on Letha's cloak. I stopped at Mattie Burns' to wash my face; face was muddy. My clothes and underclothes were also muddy. This mud was gotten

on me at the place where he made the assault on me. Miss Burns
was at Ely Daniel's. From Miss Burns' I went on home. Don't
know when I got home. It was before dark. They were all there
in the house, and I went in and pulled off my things. I was wet,
and when I done that it was getting dark. I changed my clothes.
I did not tell my father and mother at that time. The reason was
that I knew they were against me going with this young man.
That was the reason I did not tell my parents. It was, I suppose,
ten minutes after the assault before I saw Miss Burns, I guess, I
don't know. She was the first person I saw after the assault. I
never saw any one in sight at the time of the assault." The record
then proceeds as follows: "The witness was shown a cloak and
she testified that it was the cloak she had on, and there is still some
mud on the cloak; it was muddy all over at the time. But the
witness has cleaned some of the mud off because it was a cloak she
borrowed that day to match her brown dress. The mud now on
the cloak was some that was gotten on it at the time of the difficulty.
The witness was also shown a dress, and she testified that it was
the dress she had on at the time of the assault. 'The dress was
torn by Clovis Rich I reckon. It was torn at the time the assault
was made.' Witness was presented with underskirt and said it was
the one she had on on the occasion in question, and it has mud on
it that was gotten there at the same time. Witness was shown a
button that she said came off the cloak and that it was lost at the
same place and at the same time; says that she did not know it
was lost until they found it. It was at this place that the button
came off the coat and was lost at this time. Witness says that she
saw the hair net afterwards as they came on to the trial that morn-
ing. 'Bill Davenport, I think, found it and I put it in my pocket.
It is the hair net I had on at that time. I was not present at the
time the hair net was found.'"

On cross-examination Docia admitted that she first told her
father and mother about the assault on the 25th of December (three
days after the alleged assault), and that she at first swore out a
warrant charging the defendant with an assault with intent to rape;
that at the preliminary trial she testified, that when she saw Mattie
Burns shortly after the assault, Mattie asked, "What makes you
so muddy?" and she said, "I fell down;" and as they went on a
little further Mattie wanted to know how she came to be so muddy

and her clothes torn, and she told Mattie that as she went on that morning there was a mud hole that she stepped across, and she tore her clothes; first told Mattie that she fell down and when Mattie asked the second time why her clothes were torn, she told Mattie that Clovis Rich threw her down, and Mattie asked, "did he get to do what he wanted to do?" and she said, "No." "On that trial I swore that I went with my father to the home of C. W. Thompson, justice of the peace, and signed an affidavit charging the defendant with an assault with intent to rape; testified that I knew the difference between doing a thing and attempting to do it.　.　. When I told Mattie Burns that the defendant did not accomplish his purpose, I meant that he did not finish. There was a penetration."

Mattie Burns in her testimony corroborated the testimony of Docia as to attending the Christmas celebration, and as to the defendant and Docia walking together towards Docia's home, and as to their getting out of sight of her. This witness swore that about an hour afterwards she saw Docia again; and she testified as follows: "When I saw her coming down the road I did not recognize her. The reason was when I last saw her with Clovis Rich she had on a dark brown dress, and as she came on down the road it appeared to be a white dress, but that proved to be her underskirt. Her underclothes were muddy and the coat she had on was muddy. Her dress was very muddy. She appeared to have been crying and looked nervous. She came up and I saw there was something wrong with her dress, it was torn and was muddy, and she appeared to be crying and looked to be very nervous, and I asked her what was wrong. Her head was muddy. She said to me then that she fell down at the time there at Mr. Daniel's. We went on down the road as far as my home, and she stated that she did not tell me the truth; said she had trouble with defendant and that she did not think he was the fellow that he was. She said that he was the one that muddied her and tore her clothes. She said he took hold of her and threw her down and muddied and tore her clothes. At my house she washed the mud from her hands and face. At first she said she fell down, and then I said to her, after she told me different, to go home and tell her father, and she said she did not know what to do. Asked her if the defendant accomplished his purpose, and she said he did not."

Several witnesses testified that a few days after the alleged assault they examined the place where the alleged assault occurred, and that there were signs of scuffling and a struggle on the muddy ground, and the imprint of a body in the mud. One witness testified that he also saw the imprint of a head in the mud, and the footprints of a man and a girl. Another witness testified that he saw signs. of a struggle upon the ground and an imprint that looked like some one had been on the ground, and that he saw also where a toe had been dug in the ground. "Somebody had their toe stuck in the ground—looked like some one was trying to get a toe holt." A witness testified that he "found a button there, the button in evidence." There was also testimony that a hair net had been found at the scene of the alleged assault. Docia testified that she wore no hat on the day in question, and that after the assault her head was muddy, and that she lost a hair net in the struggle.

The defendant in his statement to the jury said that he accompanied Docia from the Christmas-tree celebration; that they were walking in the public road, and that he had to help her across a mud hole, "and we got on the bank of the road and we came to where there was a stump on the side of the road, only a few inches from the bank of the road, and I was walking arm in arm with her, and I fell behind and let her pass the stump, and I slipped and started to fall off, and naturally grabbed hold of her, and then we both fell off the bank and down in the road. I rose up as soon as I could and helped her up. If her clothes were torn and in the condition they are now, it might have happened then, but I never noticed it then—I never noticed her clothes being torn. We both got a little bit muddy, and we walked out a ways in the road there, and she says, 'It looks like it is going to rain hard,' and says, 'Would you mind running down to your house and getting your car and carrying me home?' And she also said, 'I don't want to be seen like this;' and I told her that I would do that. . . I went on down to the house, only two or three hundred yards, and she said she would wait until I got back, and when I got there I found out I couldn't run the car, it wasn't fixed, and I went back up to the road to tell her and she wasn't there. . . I learned that she had first swore out a warrant charging assault with intent to rape, and later a warrant charging rape, and I was advised by friends to get

out of the neighborhood until they could investigate this charge and get up evidence, and then I intended to come back and face trial. On Friday, December 28th, I took the train at Regal, North Carolina, and when I got on the train at the depot the deputy sheriff of this county was on the train, and he put me under arrest, and we got off at Andrews and got a Ford automobile and started back, and I says, 'What right have you got to come in North Carolina and arrest me?' And he said he had a right to go anywhere, and I thought he was out of his jurisdiction and I was out of Georgia, and I knew he was a Georgia officer, and I didn't feel under any obligations to go back with him, and I happened to know one of the fellows in the front seat, and I spoke to him, and while the car was going very slow, running in low gear, I just opened the door and stepped out and run off. On the following day, December 29th, I got off the train at Maryville, Tennessee, and was walking around the town, and was arrested and locked up. When Sheriff Jones came after me he asked me if I would go back without requisition papers, and I told him I would. Now, I am not guilty of this charge. I made no assault on that girl. I never attempted to rape her nor raped her."

An uncle of the defendant testified that on the day of the alleged assault he saw the defendant and a girl, who was unknown to him, walking arm in arm upon the public road, and that he saw them fall off the bank into the road; that there was a stump on the bank of the road, and that a trail ran between the stump and the road, and that they were walking the trail single file, the girl in front, when "all of a sudden they fell in a pile in the road. They got up and got on the bank. Defendant came on down across the woods into the trail and I spoke to him. He was muddy and I asked him if he had been taking a swim in the road. He laughed and I asked him why he did not go on home with her, and he said he was going home and get his car and take her home. . . After they fell I don't know where the girl went, did not see her leave; . . saw them get up. . . I saw the girl get up from the road on the bank. . . I was present at the commitment trial, was not sworn as a witness." This witness admitted on cross-examination that he had subpoenaed witnesses in the case and had conferred with the defendant's counsel, and that he had studied law.

The State introduced in evidence the statement made by the de-

fendant on the preliminary trial. In this statement he made the following explanation about the alleged accidental fall in the mud: "We were passing along the public road returning towards her home, and near Mr. Daniel's residence, the road being muddy at this place, I was aiding her across the muddy part of the road so as to get on drier ground when we both slipped and fell, and as I fell I naturally caught hold of her, and we both reached the ground together. I immediately arose and helped her to her feet and carried her across the road to the dry ground."

It will be noticed that in this first statement (which was made about three months before his statement to the jury, and when his memory about the events was fresher than at his trial) he said nothing about their walking single file along the trail on the bank between the stump and the road, or about their *falling off the bank* into the road. On the contrary, he stated that they slipped and fell *while they were crossing the road,* and that he helped her up *and carried her across the road to the dry ground.* In view of these material contradictions between the two statements, the jury were amply authorized to reject both statements, and also to reject the testimony of the defendant's uncle about seeing them fall *off the bank* into the road.

Upon a trial under an indictment charging rape, it is well settled that where the evidence demands a finding that the carnal knowledge was realized, and the only possible question is as to the force and the consent, a verdict for an assault with intent to rape is unauthorized (*Kelsey* v. *State,* 62 *Ga.* 558); and where the alleged victim is a mature woman and testifies that her sexual organ was penetrated by the sexual organ of the accused, and there is no such material contradiction in her testimony, nor any such contradiction between her testimony and the other evidence, as would have authorized a finding that only an assault with intent to rape had been committed upon her, a verdict for that offense is contrary to law and the evidence. *Welborn* v. *State,* 116 *Ga.* 522 (2) (42 S. E. 773). However, where the alleged victim, as in the instant case, a young and innocent country girl, testifies that the accused, with violence and force, and against her will and consent, threw her upon the ground, tore her clothing, and made a violent assault upon her, that she struggled and resisted and tore out some of his hair, and struck him with a rock, and finally escaped

and ran away before he had accomplished his purpose, her testimony that during the struggle and assault his privates had penetrated her privates did not demand a finding that the offense of rape had been committed upon her, where it also appeared in the evidence that soon after the assault and on the same day she told Mattie Burns, the first person she met, after the assault, that the accused had not accomplished his purpose, and where several days later she swore out a warrant charging the accused with the offense of assault with intent to rape.

In view of all the evidence, direct and circumstantial, this court can not hold that the jury were not authorized to conclude that this young girl, who is presumed to be innocent and virtuous until the contrary is shown (and it was not so shown in this case) was mistaken when she testified that her privates had been penetrated by the defendant's privates. Under the excitement and terror occasioned by the defendant's violent assault upon her person and virtue, when she was screaming and struggling to throw him off, and pulling his hair, and striking him with a rock, and being ignorant and innocent concerning the act of sexual intercourse, she might have thought that his sexual organ had penetrated her sexual organ when it was merely violently pushing against it and causing her pain, or had penetrated her *rectum,* instead of her *sexual organ.* In such a struggle such a supposition is not improbable. In other words, the jury were authorized to find that this innocent little country girl had not been raped, but that she had been violently assaulted with intent to rape. See, in this connection, *Jones* v. *State,* 68 *Ga.* 760 (4) ; *Dalton* v. *State,* 27 *Ga. App.* 288 (108 S. E. 122) ; *Byrd* v. *State,* 28 *Ga. App.* 504 (111 S. E. 924) ; *Whiddon* v. *State,* 31 *Ga. App.* 776 (4) (122 S. E. 243).

The decisions cited and relied on by the plaintiff in error are distinguished by their particular facts from this case. In *Kelsey* v. *State,* supra, the alleged victim (as shown by the original record of file in the office of the clerk of the Supreme Court) was a grown woman, 22 years old, and, at the time of the alleged rape, was engaged to be married to the accused, and she testified positively and unequivocally that the complete act of sexual intercourse had been accomplished; and there was no conflict in her testimony as to this question, and no other evidence, direct or circumstantial, tending to cast a doubt upon this part of her evidence. The

11

accused in that case did not deny the fact of sexual intercourse. His sole defense ·was that it was done with her consent. In *Welborn* v. *State,* supra, as pointed out in *Byrd* v. *State,* supra, the alleged victim testified positively and unequivocally that the accused, by force and violence, and against her will and consent, had sexual intercourse with her, and there were no such material contradictions in her testimony, nor such contradictions between her testimony and the other evidence, as would have authorized a finding that only an assault with intent to rape had been committed upon her, but, on the contrary, her testimony demanded a finding that the defendant had fully accomplished the act of sexual intercourse with her, and that he was guilty of rape.

In the instant case it clearly appears from the brief of the evidence, and especially from the cross-examination of the prosecutrix, that the defense was contending before the court and jury, first, that no offense against Docia had been committed by the accused; and, second, that if any offense had been committed, it was an assault with intent to rape, and not rape. The first contention was negatived by the evidence as to the girl's torn and muddy clothes, the signs of a violent struggle upon the ground, and the imprint of a head in the mud, and mud upon her head, her tearful and nervous condition, and the flight of the defendant from the State, soon after the warrant against him was issued, and his escape and second flight from the officers, after he had been arrested in North Carolina. There remained then but one issue in the case, to wit, whether the defendant had committed rape or an assault with intent to rape; and under all the facts of the case this court is of the opinion that the jury were amply authorized to find that the girl was mistaken when she testified that her privates had been penetrated by the privates of the defendant, and to return a verdict of an assault with intent to rape.

*Judgment affirmed. Luke and Bloodworth, JJ., concur.*